**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SCOTTY CALVIN CARRILLO, | ) | CASE NO. 1:22-CV-02164-PAG |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| v. | ) | PATRICIA A. GAUGHAN |
| | ) | |
| | ) | U.S. MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.     INTRODUCTION

Plaintiff Scotty Calvin Carrillo ("Mr. Carrillo") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for Supplemental Security Income ("SSI"). U.S. District Judge Patricia A. Gaughan has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court VACATE and REMAND the ALJ's decision to the Commissioner.

## II.     PROCEDURAL HISTORY

Mr. Carrillo filed an application for SSI on July 24, 2020, alleging a disability onset date of October 31, 2014. (Tr. 371-72.)[1] His application was denied initially and upon reconsideration. (Tr. 289-93, 295-97.) Mr. Carrillo requested a hearing before an administrative law judge ("ALJ"). (Tr. 298-99.) On September 22, 2021, an ALJ held a telephone hearing due to the COVID-19 pandemic. (Tr. 211-34.) Mr. Carrillo, represented by counsel, and a vocational expert ("VE") both

---

[1] The administrative transcript ("Tr.") appears at ECF Doc. 6 on CM/ECF.

testified. (*Id.*) The ALJ issued a written decision on October 5, 2021, finding Mr. Carrillo was not disabled under the Social Security Act. (Tr. 186-202.)[2] The ALJ's decision became final on October 17, 2022, when the Appeals Council declined further review. (Tr. 1-6.) On December 2, 2022, Mr. Carrillo filed a Complaint challenging the Commissioner's final decision. (ECF Doc. 1). He raises the following assignment of error:

> (1) The ALJ's RFC finding is not supported by substantial evidence because his evaluation of psychiatric nurse practitioner Dawn Dunaway's medical opinion did not comply with the revised regulations for evaluating opinion evidence.

(ECF Doc. 11, PageID#1934.)

## III.    BACKGROUND INFORMATION[3]

### A.    Personal, Educational, and Vocational Experience

Mr. Carrillo was born in 1999, and he was 21 years old on the application filing date. (Tr. 200.) He graduated from high school and did not complete any type of specialized job training. (Tr. 200, 393.) Mr. Carrillo lives with a roommate, who is his best friend. (Tr. 213.)

### B.    Relevant Hearing Testimony

#### 1.    *Mr. Carrillo's Testimony*

Mr. Carrillo testified that his mental health impairments include PTSD, bipolar disorder, panic disorder, agoraphobia, and anxiety. (Tr. 214). He testified that he has been affected with these disorders since he was 14 years old. (*Id.*)  He has been hospitalized twice, first when he was 14 years old, and on another occasion when he was 18 years old. (*Id.*)

---

[2] In August 2020, Mr. Carrillo's counsel submitted a letter requesting a reopening of Mr. Carrillo's prior application that was denied on November 25, 2019. (Tr. 186.) The ALJ denied this request. (*Id.*) Accordingly, the ALJ found that despite the alleged onset date of October 31, 2014, Mr. Carrillo's request for hearing through the prior claim denial date is dismissed per *res judicata*. (*Id.*)

[3] Because Mr. Carrillo's merits brief arguments revolve around his mental impairments, this summary is limited to testimony and evidence regarding such impairments.

Mr. Carrillo suffers from nightmares and intrusive thoughts stemming from an almost nine-year history of sexual abuse as a minor. (*Id.*) His anxiety affects his ability to leave home; he rarely leaves his house, and he has a "big fear" of people. (*Id.*) He avoids socializing with others because it triggers his anxiety.  (Tr. 220).  Due to his bipolar disorder, he experiences mood swings, though he typically experiences depressive episodes more than manic episodes. (*Id.*) He stated that these depressive episodes make it difficult for him to get out of bed and function on a day-to-day basis. (*Id.*)

He testified that he experiences panic attacks approximately three times a week that can be very debilitating. His panic attacks are triggered by scenes of violence, hearing his abuser's name, the sight of a red pickup truck, and being touched. (*Id.*) Symptoms include racing thoughts, racing heartbeat, hyperventilating, sweaty palms, shaking, crying, and "a major sense of dread." (*Id.*). When he feels an oncoming panic attack or is experiencing a panic attack, he takes an Ativan, distracts himself, and uses breathing techniques. (Tr. 218-19.) Mr. Carrillo testified that he experiences flashbacks if he sees or hears things related to his sexual abuse. (Tr. 217.) His flashbacks typically last 45 minutes and occur about three times a week. (*Id.*) He further testified that his flashbacks result in residual problems, such as difficulty functioning, desire to isolate from others, and anxiety. (Tr. 218.) These flashbacks have also triggered panic attacks. (*Id.*)

Mr. Carrillo also testified that he takes four- to six-hour naps during the afternoon approximately four times a week because his sleep is disturbed during the night. (Tr. 219.) He testified that in addition to Ativan, he takes Latuda daily, Effexor three times a day, Vistaril when he feels necessary, and Zolpidem. (*Id.*)

Mr. Carrillo also stated that he has difficulty socializing with others because it triggers his anxiety. (Tr. 220.) He testified that he has a fear of crowds and does not go to large stores. (*See*

Tr. 220-21.) He testified that his agoraphobia keeps him isolated at home, and he attends counseling relating to this issue. (Tr. 221.)

Mr. Carrillo testified that he has difficulty remembering and understanding due to issues with concentration. (Tr. 223.) Specifically, Mr. Carrillo stated that his PTSD results in intrusive thoughts that make it difficult for him to focus on what people are saying and retaining that information. (*Id.*) He stated that this difficulty further extends to his ability to absorb information from books and magazines. (*Id.*)

Mr. Carrillo testified that one of his medications makes him groggy, and it is hard for him to wake up in the morning. (Tr. 225.) He stated that he had issues with attendance when he tried to work (*id.*), and these attendance issues stemmed primarily from his PTSD and anxiety. (Tr. 226.) He stated that he experienced flashbacks and PTSD at work, and on a few previous occasions he had to leave work to retrieve his medications or go home. (*Id.*) He also testified that he struggles with hypervigilance and paranoia resulting from his PTSD, and this has negatively affected his employment. (Tr. 227.)

### 2. Vocational Expert's Testimony

The ALJ first asked the VE whether an individual with Mr. Carrillo's education could perform work at the medium exertional level, except limited to no climbing of ladders, ropes, or scaffolds; frequent climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; no exposure to hazards such as heights, machinery, or commercial driving; no work performed outdoors; performing routine tasks in a low-stress environment; no fast-paced, strict quotas, or frequent duty changes involving superficial, interpersonal interactions with coworkers and supervisors (specifically no arbitration, negotiation, or confrontation); and no work involving interaction with the public as a job requirement. (Tr. 229.) The VE opined that this individual could

perform work as a laundry worker, checker, sorter, document preparer, and hand mounter. (Tr. 229-30.)

The ALJ then asked the VE whether an individual with the same parameters as the first hypothetical, except with the further limitations of being off-task at least 20 percent of the time due to symptoms from his medically determinable impairments, could perform jobs existing in significant numbers in the economy. (Tr. 231.) The VE opined that there would be no work available. (*Id.*)

Mr. Carrillo's counsel asked if an individual could perform work if the individual needed to leave the workplace or be absent approximately four times a month due to his impairments. (*Id.*) The VE opined there is no work available. (*Id.*) Mr. Carrillo's counsel then asked whether workplaces would tolerate an individual not staying on the work site frequently during the day. (*Id.*) Interpreting "frequently" as up to two-thirds of the workday that the individual is no longer at the work site, the VE opined that this behavior would indicate that the individual is off-task more than 15% of the workday, which would be work-preclusive. (Tr. 231-32.) The VE further stated that the threshold for off-task behavior to maintain employment is 15%. (Tr. 232.)

Mr. Carrillo's counsel finally asked whether the individual would be permitted to take a nap during the day because of his impairments. (*Id.*) The VE opined that this behavior would not be permissible. (*Id.*)

### C.  Relevant Non-Medical/Medical Opinion Evidence

#### 1.  *State Agency Opinions*

On September 17, 2020, Dr. Joan Williams, Ph.D., reviewed Mr. Carrillo's medical record at the initial level of consideration. Dr. Williams discussed Mr. Carrillo's sustained concentration and persistence limitations. (Tr. 275.) Dr. Williams found Mr. Carrillo is limited to simple

instructions and tasks due to emotional factors, not cognitive factors. (*Id.*) Simple tasks are less demanding emotionally. (*Id.*) Complex tasks are more likely to increase anxiety, reduce Mr. Carrillo's morale, and prompt urges to withdraw from the worksite. (*Id.*) Mr. Carrillo retains the ability to conduct a routine of simple tasks. (*Id.*)

Regarding Mr. Carrillo's social interaction limitations, Dr. Williams opined that the record reflects that Mr. Carrillo has social affiliative needs and interests, ability to form social attachments, and ability to establish cooperate relationship with behavioral health clinicians and medical personnel. (Tr. 276.) Dr. Williams further stated that Mr. Carrillo retains the social ability to interact appropriately with coworkers and supervisors. (*Id.*). Dr. Williams noted, however, that Mr. Carrillo lacks the ability to deal with the unpredictable and occasionally acrimonious experiences of working with the general public. (*Id.*)

With respect to Mr. Carrillo's adaptation limitations, Dr. Williams opined that Mr. Carrillo lacks the ability to adjust to work settings imposing daily novel tasks and problem-solving. (*Id.*). Dr. Williams noted that Mr. Carrillo retains the ability to adjust to work settings that are more predictable and routine. (*Id.*) Dr. Williams opined that Mr. Carrillo can adjust to common workplace changes, such as scheduling changes, introduction of new simple tasks, and assignment to a new supervisor. (*Id.*) Dr. Williams indicated that Mr. Carrillo lacks the ability to handle roles requiring frequent travel to multiple worksites in the community. (*Id.*) Dr. Williams opined Mr. Carrillo can adjust to an assigned worksite. (*Id.*)

On December 3, 2020, Dr. David Dietz, Ph.D. reviewed the record at the reconsideration level and affirmed Dr. Williams' opinion. (Tr. 283-85.)

### 2.  *Dawn Dunaway, APRN, PMH-CNS*

On January 23, 2021, Nurse Dunaway completed an Off-Task Absenteeism Questionnaire regarding Mr. Carrillo's mental limitations.[4] Nurse Dunaway opined Mr. Carrillo would likely be off-task at least 20% of the time. (*Id.*). Nurse Dunaway indicated that Mr. Carrillo has intrusive thoughts and panic attacks that affect his ability to concentrate, pay attention, and/or focus on a sustained basis. (*Id.*) Nurse Dunaway indicated drowsiness would likely result in Mr. Carrillo being off-task. (*Id.*) Nurse Dunaway then opined that Mr. Carrillo would be absent from work about four times a month due to his impairments or treatments. (*Id.*)

### 3.  *Mr. Carrillo's Adult Function Report*

Mr. Carrillo indicated that he is unable to work due to his PTSD, anxiety, bipolar disorder, and agoraphobia. (Tr. 401.) He stated that his anxiety often leads to "debilitating mental breakdowns" such as panic attacks. (*Id.*) He reported that he cannot function under stress and "shut[s] down." (*Id.*) He indicated that his PTSD results in flashbacks and paranoia that makes it difficult for him to attend a work shift. (*Id.*)

Mr. Carrillo also reported that his sleep schedule is inconsistent; specifically, sometimes he stays awake for the entire night and sleeps throughout the day. (Tr. 402.) He also reported that he goes outside once a week. (Tr. 404.) He reported that he cannot go out alone, he requires emotional support when leaving the house, and he only goes out with his roommate. (*Id.*) Mr. Carrillo indicates that his conditions affect his ability to complete tasks and to concentrate. (Tr. 406.)

Mr. Carrillo also discussed how his illnesses and conditions affect his ability to work. (Tr. 408.) His depressive episodes from his bipolar disorder cause him to lack the motivation to get out

---

[4] Nurse Dunaway also released two other medical opinions (Tr. 1694, 1696), but Mr. Carrillo solely challenges the ALJ's evaluation of the Off-Task Absenteeism Questionnaire.

of bed, affect his daily activities, and require encouragement to complete chores and feed himself. (*Id.*) As stated previously, his conditions result in an inconsistent sleep schedule. (*Id.*) Further, when his conditions are exacerbated, it can cause physical symptoms such as nausea, vomiting, and dizziness. (*Id.*) His conditions have caused attendance problems at work, and he has been fired for poor attendance. (*Id.*)

### 4. *Mr. Carrillo's Appeal Disability Report*

Mr. Carrillo reported worsening PTSD. (Tr. 420.) He stated that he had been struggling with more nightmares and flashbacks, "reliving the sexual abuse [he] dealt with for years." (*Id.*) He wrote that this was causing him to feel more hopeless and very depressed. (*Id.*)

### D. <u>Relevant Medical Evidence</u>

On September 21, 2019, Mr. Carrillo reported that he was able to resume taking all of his prescribed medications. (Tr. 1328.) He reported that it was difficult to get up in the morning and that he felt tired all day. (*Id.*) Nurse Dunaway listed tiredness as a side effect of his medications. (*Id.*) Mr. Carrillo reported that going out in public exacerbated his anxiety, and he rated his anxiety as an eight out of ten. (*Id.*) His Prazosin was reducing the frequency of his nightmares to two times per week. (*Id.*) On examination, Nurse Dunaway noted poor attention and concentration; nervous mood; highly anxious affect; soft speech; and paranoid thought content, *e.g.,* seeing the red pickup truck of the man who abused him. (*Id.*) Nurse Dunaway increased Mr. Carrillo's dosage of Latuda and Prazosin and started him on Vistaril as needed for anxiety. (Tr. 1329.)

On August 25, 2020, Alexander Vu, M.A., a student clinician in family medicine,[5] evaluated Mr. Carrillo. At this session, Mr. Carrillo reported symptoms of depressed mood, anxiety, and panic attacks. (Tr. 1510.) His depression symptoms include depressed mood, low

---

[5] During his sessions with Mr. Carrillo, Mr. Vu was supervised by licensed psychologists that also signed off on the treatment records. (*See, e.g.*, Tr. 1639-40, 1685.)

mood, feeling hopeless, lack of interest/pleasure, lack of motivation and energy, and difficulty sleeping. (Tr. 1511.) He experienced a manic episode a year prior to this appointment, which he described as feeling euphoric, spending money he did not have, having lots of energy, and being promiscuous. (*Id.*)

Mr. Carrillo also reported that he experienced sexual abuse between the ages of four years old to thirteen years old. (*Id.*) He reported experiencing panic attacks once or twice a month that were triggered by memories of this traumatic experience. (*Id.*) He also experiences situational anxiety, *e.g.*, going out in public, talking on the phone, having something important to do, and driving. (*Id.*) Due to his PTSD, Mr. Carrillo experiences flashbacks, intrusive memories, nightmares, and difficulty sleeping, and he avoids places, things, and people that remind him of the traumatic situation he experienced. (*Id.*) Mr. Vu's mental status examination noted that Mr. Carrillo was oriented to time, person, and place; his concentration was sustained; he was cooperative; his mood was euthymic; his affect was congruent; his thought process was logical; his thought content and cognitive findings were normative; and he had good insight and judgment. (Tr. 195.)

On September 1, 2020, Mr. Vu met with Mr. Carrillo. Mental status examinations indicated Mr. Carrillo was cooperative and oriented to time, person, and place; his speech was spontaneous; his thought process was logical and organized; his associations were tight; he had good insight and judgment; his recent and remote memories were within normal limits; his attention span and concentration were sustained; his fund of knowledge was okay; his mood was euthymic; and his affect was full. (Tr. 1646.)

On September 19, 2020, Nurse Dunaway evaluated Mr. Carrillo. Mr. Carrillo reported that he had been staying home and had a "pretty depressed" mood. (Tr. 1342.) He also reported that

Trazodone has not been working. (*Id.*) He stated he has racing thoughts and he "can't shut [his] brain down." (*Id.*) He reported sleeping two to six hours a night. (*Id.*) He described his mood as "low," and stated that he lacks motivation to do things. (*Id.*) He reported that his panic attacks have been lower since his last visit, except for the law few weeks where they increased due to racing thoughts. (*Id.*) The side effects of his medication included tiredness and difficulty focusing in the morning. (*Id.*). Mental status examinations revealed Mr. Carrillo was well-dressed and oriented to time, place, and person; had fair recent and remote memories; had adequate fund of knowledge; was cooperative; reported "low" mood; had constricted affect and congruent mood; had normal speech; had logical thought; and demonstrated fair insight and judgment. (*Id.*) Ms. Dunaway discontinued Trazodone, increased Vistaril, and increased Effexor. (Tr. 1843.)

On November 28, 2020, Mr. Carrillo reported that Remeron is "hit or miss" for treating his symptoms. (Tr. 1838.) He also reported that Effexor seemed to help, and that his physical responses to anxiety "were a lot less." (*Id.*) He indicated that Effexor makes him somewhat tired, but his body seemed to adjust to the medication. (*Id.*) He reported sleeping four to eight hours a night and napping during the day if he had nothing planned during the day. (*Id.*) He described his mood as "generally ok[ay]" but also stated that his mood had been "pretty down" the past few weeks. (*Id.*) He reported that he experienced more panic attacks in the past one to two months than he had in a while. (*Id.*) Mental status examination revealed Mr. Carrillo was oriented to time, place, and person; his recent and remote memory was fair; his attention and concentration was fair; his fund of knowledge was adequate; he was cooperative; he had normal speech; his language was intact; and he had logical thoughts. (*Id.*) Nurse Dunaway discontinued Remeron, increased Vistaril, and increased Effexor. (Tr. 1839.)

On December 1, 2020, Mr. Carrillo attended a telemedicine appointment with Mr. Vu. Mr. Carrillo reported that he had been having flashbacks and nightmares about sexual abuse. (Tr. 1684.) He also endorsed panic attacks related to memories of prior sexual abuse by a family member starting at four years old, and dysfunctional thoughts of self/self-esteem stemming from this abuse. (*Id.*) Mr. Carrillo's mental status examination revealed that he was cooperative and oriented to time, person, and place; his thought process was logical and organized; his associations were tight; he had good insight and judgment; his recent and remote memories were within normal limits; his attention span and concentration were sustained; his fund of knowledge was okay; his mood was euthymic; and his affect was full range. (Tr. 1684-85.)

On January 19, 2021, Mr. Carrillo met with Mr. Vu. Mr. Carrillo reported he had been in a depressed mood for the past few weeks because of intimacy issues with his boyfriend related to prior trauma. (Tr. 1713.) He also reported becoming very tense and having racing thoughts and nightmares/flashbacks three times a week. (*Id.*) Mr. Carrillo's mental status examination noted Mr. Carrillo was cooperative and oriented to time, person, and place; his speech was spontaneous; his thought process was logical and organized; his associations were tight; he had good insight and judgment; his recent and remote memories were within normal limits; his attention span and concentration were sustained; his fund of knowledge was okay; his mood was euthymic; and his affect was full. (Tr. 1714.) The clinical impression noted his symptoms remained unchanged. (*Id.*)

On January 23, 2021, Mr. Carrillo attended an appointment with Nurse Dunaway. Mr. Carrillo reported that increasing the Effexor was helpful, and he denied side effects. (Tr. 1834.) He reported that Ambien helped regulate his sleep, but the medication made him tired the next day. (*Id.*) He described his mood as "content." (*Id.*) He rated his anxiety as 7/10. (*Id.*) He reported that he had experienced a panic attack about five days prior to his appointment. (*Id.*) He also

reported that his panic attacks increased in December but decreased in January. (*Id.*) He reported experiencing nightmares four times a week, flashbacks once a week, and intrusive thoughts every other day. (*Id.*) His depression and anxiety negatively affected his nightmares and flashbacks. (*Id.*) He told Nurse Dunaway that he checks his doors, locks, and windows daily. (*Id.*) Mental status examinations revealed Mr. Carrillo was oriented to time, place, and person; his recent and remote memory was fair; his attention and concentration was fair; his fund of knowledge was adequate; he was cooperative; he had normal speech; his language was intact; he had logical thoughts; he had associations within normal limits; and he denied suicidal thoughts. (*Id.*) Mr. Carrillo had a diagnostic impression of bipolar disorder depressed, PTSD, and panic disorder with agoraphobia. (Tr. 1835.) Nurse Dunaway added Ambien to Mr. Carrillo's medication regimen and increased his Effexor dosage. (*Id.*)

On February 16, 2021, Mr. Carrillo again met with Mr. Vu. His mental status examinations remained the same from his January 2021 appointment. (Tr. 1722; *see* Tr. 1714.) The clinical impression section of the treatment notes indicated that Mr. Carrillo's mood was stable and that his symptoms were unchanged. (Tr. 1722.)

On March 20, 2021, Mr. Carrillo attended a telemedicine visit with Nurse Dunaway. He reported that Ambien helped "a lot" and that he was going to bed at the same time every night on a schedule and sleeping 10 hours a night. (Tr. 1869.) He described his mood as "stable for the most part." (*Id.*) Mr. Carrillo also reported that the increased Effexor helped a lot. (*Id.*) He further reported that he takes Vistaril one to two times a week on average for anxiety attacks, and that he experiences panic attacks one to two times every two weeks. (*Id.*) A side effect of his medications is waking up drowsy. (*Id.*) His mental status examinations remained unchanged from January 23,

2021. (*Id.*; *see* Tr. 1834.). Mr. Carrillo was diagnosed with bipolar depression, chronic PTSD, and panic disorder with agoraphobia. (Tr. 1870.)

On August 5, 2021, Mr. Carrillo presented for treatment to New Leaf Counseling Services. He reported a history of sexual abuse and having many intrusive thoughts relating to the abuse. (Tr. 1874.) In further describing his trauma history, he reported he experienced sexual abuse from four to thirteen years old. (Tr. 1876.) When he was 10 years old, he told his therapist about his sexual abuse, stated that his family "basically disowned [him]," and his father still speaks to his abuser. (*Id.*) Mr. Carrillo endorsed frequent anxiety, trouble leaving the house, and paranoia. (Tr. 1874.) He reported his mood swinging daily as opposed to bipolar "episodes." (*Id.*) He reported always having sleep issues and stated that he was currently sleeping more during the day then at night. (*Id.*) He indicated that his anxiety and agoraphobia have worsened since adulthood. (*Id.*) He reported having trouble making phone calls and going shopping. (*Id.*) He reported a history of suicidal thoughts, and that he was hospitalized when he was 14 years old and 18 years old. (*Id.*) He reported self-harm that started in college but stated that he has not committed self-harm in the past six months leading to this session. (*Id.*) He reported the following symptoms: extreme fear when being in public places or in a crowd causing him to avoid stores and leaving home; anxiety; restlessness; easily fatigued; tension; sleep disturbance; intrusive thoughts; hypervigilance; and negative emotions associated with traumas. (Tr. 1877.)

## IV.    THE ALJ'S DECISION

The ALJ first determined that Mr. Carrillo had not engaged in substantial gainful activity since July 24, 2020. (Tr. 189.) The ALJ found that Mr. Carrillo had the following severe impairments: gender dysphoria; bipolar disorder; anxiety disorder with panic, agoraphobia, and post-traumatic stress disorder (PTSD); sinus tachycardia with palpitations; mild obesity; and

marijuana disorder. (*Id.*) However, the ALJ found that none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 189-92.) The ALJ determined that Mr. Carrillo could perform work at the medium exertional level, except that he can never climb ladders, ropes, or scaffolds; frequently climb ramps and stairs; frequently balance, stoop, kneel, crouch, and crawl; must avoid exposure to hazards (heights, machinery, commercial driving); must avoid work that is performed outdoors; and can perform routine tasks in a low stress environment (no fast pace, strict quotas, or frequent duty changes) involving superficial interpersonal interactions with coworkers and supervisors (no arbitration, negotiation, or confrontation), and no work involving interaction with the public as a job requirement. (Tr. 192.)

The ALJ next determined that Mr. Carrillo has no past relevant work. (Tr. 200.) The ALJ further determined that transferability of jobs skills is not an issue because Mr. Carrillo does not have past relevant work. (*Id.*) Considering Mr. Carrillo's age, education, work experience, and residual functional capacity, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Mr. Carrillo could perform, such as employment as a hand packager, laundry worker, checker, sorter, document preparer, and hand mounter. (Tr. 200-01.) Accordingly, the ALJ concluded that Mr. Carrillo was not disabled within the meaning of the Social Security Act since his application filing date. (Tr. 202.)

## V.    LAW & ANALYSIS

### A.  <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott*

14

*v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.

2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B. Standard for Disability

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id*.

### C. Evaluation of Medical Opinions (Step Four) – Standard

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how she considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is

16

not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. See 20 C.F.R. § 404.1520(c)(1)-(2).

> **D.  The ALJ Inappropriately Assessed the Persuasiveness of Nurse Dunaway's Medical Opinion.[6]**

Mr. Carrillo challenges the ALJ's evaluation of the supportability and consistency of Nurse Dunaway's opinion in her Off-Task/Absenteeism Questionnaire. Regarding supportability, Mr. Carrillo contends that the ALJ's consideration of this factor is not supported by substantial evidence because it mischaracterizes the underlying record evidence. (ECF Doc. 8, PageID#1915.) Mr. Carrillo further argues that the ALJ erred specifically in stating that Nurse Dunaway's opined limitations "appear to be based on the claimant's subjective complaints rather than objective findings." (*Id.*) (citing Tr. 199). He contends that the nature of mental health treatment relies on a patient's self-reported symptoms, and dismissal of the opinion on that ground is therefore improper. (*Id.*) With respect to consistency, Mr. Carrillo contends that the ALJ incorrectly determined that the bases of Nurse Dunaway's opinion conflicts with Mr. Carrillo's treatment notes. (*Id.* at PageID#1915-17.) Rather, based on other evidence that the ALJ cited, Mr. Carrillo contends that the ALJ's conclusion is internally inconsistent. Further, Mr. Carrillo contends that

---

[6] Nurse Dunaway's opinion in her Off-Task/Absenteeism Questionnaire is fully summarized in the "Medical/Non-Medical Opinion Evidence" section of this Report and Recommendations.

the ALJ's statement that Mr. Carrillo had a normal mood and affect at doctor appointments was a mischaracterization of the record. (*Id.* at PageID#917.)

In response, the Commissioner argues that the ALJ's decision shows that he set forth a specific rationale for finding that Nurse Dunaway's opinion was not supported by and was not consistent with the record evidence. (ECF Doc. 10, PageID#1928-29.) The Commissioner argues that Mr. Carrillo improperly relies on his own "list of subjective complaints" that he reported to Nurse Dunaway, rather than objective medical findings. (*Id.*) Finally, the Commissioner argues that the Sixth Circuit and courts in the Northern District of Ohio have found that opinions regarding absences and breaks at a work-preclusive frequency are tantamount to a disability opinion. (*Id.* at PageID#1931.)

### 1. *Medical Opinions Regarding Absenteeism and Breaks Are Not Issues Reserved to the Commissioner.*[7]

The Commissioner argues that opinions regarding absences and breaks at a work-preclusive frequency are tantamount to a disability opinion. (ECF Doc. 10, PageID#1931.) Mr. Carrillo maintains that Nurse Dunaway's opinion did not touch on an issue reserved to the Commissioner. (ECF Doc. 11, PageID#1938.) Mr. Carrillo further asserts that the case law upon which the Commissioner relies is distinguishable and inapposite. (*Id.* at PageID#1938-41.) Mr. Carrillo's arguments are well-taken.

The Commissioner's argument that opinions regarding absenteeism and breaks encroaches into a matter reserved by the Commissioner falls short for three reasons: (1) the Sixth Circuit has rejected the Commissioner's broad proposition; (2) courts within the Sixth Circuit have declined to take this position; and (3) the Commissioner's cited case law is readily distinguishable and

---

[7] For logical flow, the Report and Recommendation first addresses the Commissioner's argument regarding absenteeism and off-task limitations.

inapposite to the instant case. While Nurse Dunaway's opinion is the type of opinion that sometimes "come[s] close to stating an ultimate opinion about the existence of a disability," *Sharp v. Barnhart*, 152 F. App'x 503, 509 (6th Cir. 2005), the Sixth Circuit has rejected the Commissioner's general proposition that such opinions remain an issue reserved to the Commissioner. *Id.* ("Nor are we aware of any regulatory or case support for the third explanation given by the ALJ—that 'the issue of disability based upon frequent absenteeism … remains an issue reserved to the commissioner.'").[8]

Indeed, similar arguments by the Commissioner have not fared well in courts within the Sixth Circuit. *See, e.g.*, *Byrd v. Comm'r of Soc. Sec.*, 2022 WL 2611352, at *5 (N.D. Ohio May 5, 2022), *report and recommendation adopted*, 2022 WL 37716932 (N.D. Ohio Aug. 29, 2022) (rejecting the Commissioner's that medical opinion regarding claimant's absenteeism was effectively an opinion on the ultimate issue of disability); *Alexander v. Saul*, No. 1:20-cv-00116, 2021 WL 2406873, at *5 (W.D. Ky. June 11, 2021) (finding that the medical opinions based upon claimant's frequent absenteeism were not on the ultimate issue of disability because despite "com[ing] close to stating an ultimate opinion[,]…they came at the end of extensive treatment for Plaintiff's migraines."); *Palmore v. Comm'r of Soc. Sec.*, No. 1:20-cv-36, 2021 WL 1169099, at *8 (S.D. Ohio Mar. 29, 2021) (rejecting the Commissioner's argument that medical opinion that claimant would be off-task more than 15% of the time was an issue reserved to the Commissioner); and *Avery v. Comm'r of Soc. Sec.*, No. 1:19-cv-1963, 2020 WL 2496917, at *10 (N.D. Ohio May 14, 2020) ("The ALJ could have rejected Dr. Grigg's opinion that Avery would miss four or more days per month – but not simply because it was a matter reserved to the Commissioner. Such a rejection would not have been supported by the law.").

---

[8] Furthermore, the Commissioner's argument is post-hoc rationale because the ALJ did not state this proposition as support for discounting Nurse Dunaway's opinions. (Tr. 198-99); *Avery*, 2020 WL 2496917, at *10.

Finally, the case law upon which Commissioner relies does not support of the Commissioner's argument that opinions regarding absenteeism and off-task frequency are issues of disability reserved to the Commissioner and are easily distinguishable from the facts here.  For example, *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 980 n.1 (6th Cir. 2011), does not address off-task or absenteeism limitations. In fact, the treating physician in that case did not offer any opinion regarding off-task frequency or absenteeism. *Sims*, 406 F. App'x at 979. Rather, the treating physician in *Sims* opined that the plaintiff could not stand for more than one or two hours and could not work a full eight-hour shift due to back and leg pain. *Id.* Thus, the *Sims* court held that the treating physician's statement that the plaintiff could not work an eight-hour shift was "tantamount to a disability opinion." *Id.* at 980 n.1.

And the court in *Chhay v. Colvin*, No. 1:13-cv-02229, 2014 WL 4662024, at *8 (N.D. Ohio Sept. 17, 2014), did not decide whether the doctor's opinion in that case was a medical opinion. Rather, the *Chhay* court described the competing approaches by other courts, assumed the opinion was a medical opinion, and found that the ALJ provided "good reasons" for rejecting it. *Id.*; *see also Bell v. Comm'r of Soc. Sec.*, No. 1:22-cv-723, 2022 WL 18156676, at *12 n.13 (N.D. Ohio Nov. 29, 2022), *report and recommendation adopted*, 2023 WL 130837 (N.D. Ohio Jan. 9, 2023) (Grimes, M.J.). Significantly, numerous courts within the Northern District of Ohio have also found that *Chhay* does not support the proposition that medical opinions regarding off-task behavior or absenteeism are tantamount to a finding of disability. *See, e.g., Roland v. Comm'r of Soc. Sec.*, No. 1:22-cv-756, 2022 WL 17081339, at *13 n.4 (N.D. Ohio Nov. 18, 2022) (Parker, M.J.); *Gerry v. Comm'r of Soc. Sec.*, No. 5:21-CV-0115-DAR, 2022 WL 6566486, at *9-10 (N.D. Ohio July 13, 2022) (Clay, M.J.), *report and recommendation adopted*, 2022 WL 4479933 (N.D. Ohio Sept. 27, 2022); *Vaughn v. Comm'r of Soc. Sec.*, No. 5:20-CV- 02868, 2022 WL 1089256,

at *11 (N.D. Ohio Apr. 11, 2022) (Knapp, M.J.), *report and recommendation adopted*, 2022 WL 1092118 (N.D. Ohio Apr. 12, 2022).

In sum, the Commissioner fails to establish that Nurse Dunaway's opinion regarding absenteeism and off-task frequency limitations are issues reserved to the Commissioner. Accordingly, this Report and Recommendation proceeds to determine whether the ALJ appropriately evaluated the supportability and consistency of Nurse Dunaway's medical opinion.

### 2. *The ALJ Did Not Appropriately Evaluate the Supportability of Nurse Dunaway's Opinion.*

The ALJ's supportability assessment of Nurse Dunaway's opinion is not supported by substantial evidence. The ALJ stated the following when assessing the persuasiveness of Nurse Dunaway's opinions:

> The undersigned finds Ms. Dunaway's opinions unpersuasive (Exhibits 28F, 29F, and 30F). Ms. Dunaway did not provide any explanation for the extreme limitation in interacting with others, being off-task, and missing work due to treatment or impairments. Treatment notes in the record do not support any of these limitations and appear to be based on the claimant's subjective complaints rather than objective findings. The claimant's mental health conditions appear well controlled with medications. Mental status examinations noted the claimant was cooperative, alert, oriented x3, and he had a normal mood and affect. Instead, the preponderance of the evidence supports the non-exertional limitations as outline in Finding No. 4 above.

(Tr. 199.)

The ALJ failed to apply proper legal standards in evaluating Nurse Dunaway's opinions. As reproduced above, the ALJ's reasons for finding Nurse Dunaway's opinion unpersuasive were: (1) that Nurse Dunaway did not provide any explanation for her opined limitations that Mr. Carrillo would be off-task and miss work due to treatment or impairments; (2) treatment notes in the record did not support any of the opined limitations; and (3) the opinion was based on Mr. Carrillo's subjective complaints. The Social Security regulations state that "supportability" is defined as

"[t]he more relevant the objective medical evidence and supporting explanations ***presented by a medical source*** are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1) (emphasis added).

The ALJ's conclusion that Nurse Dunaway's opinion is unpersuasive because it was based on Mr. Carrillo's subjective complaints was an inappropriate rationale to discount the opinion's supportability. In the context of mental impairments, a plaintiff's subjective statements are an appropriate basis for a doctor's opinion on functional abilities. *See Blankenship v. Bowen*, 874 F.3d 1116, 1123 (6th Cir. 1989) (citing 20 C.F.R. § 404.1529). "The suggestion that a trained mental health clinician's opinions can be rejected merely because they are based upon clinical observations (including the analysis of subjectively reported symptoms) has been rejected by the Sixth Circuit." *Jearame B. v. Comm'r of Soc. Sec.*, No. 1:21-cv-228, 2022 WL 3154131, at *5 (S.D. Ohio Aug. 8, 2022) (citing *Blankenship*, 874 F.2d at 1121); *see also Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 526 (6th Cir. 2014) ("Even if [the doctor] had based his medical opinion solely on Plaintiff's own reports of hallucinations, nightmares, flashbacks, isolation, and psychological numbness, that likely would not have provided sufficient basis for the ALJ's rejection of his medical opinion."); *Todd v. Comm'r of Soc. Sec.*, No. 3:20-cv-1374, 2021 WL 2535580, at *8 (N.D. Ohio June 3, 2021), *report and recommendation adopted*, 2021 WL 2530846 (N.D. Ohio June 21, 2021) ("[A] critique that rejects the opinion of a psychological source because it relied on a patient's report of symptoms … would be an improper basis upon which to discount the opinion.").

The ALJ's reasoning that Nurse Dunaway did not provide any explanation for her opined limitations is also inaccurate. While Nurse Dunaway's explanation is limited,[9] she opined that Mr. Carrillo would be off task due to an inability to concentrate, pay attention, and/or focus on a sustained basis due to intrusive thoughts and panic attacks and drowsiness (Tr. 1696.) The Commissioner argues that the ALJ found that Nurse Dunaway did not provide any explanation as to the frequency or severity of those symptoms or how these symptoms would impact Mr. Carrillo's ability to sustain work activity. (ECF Doc. 10, PageID#1928.) The Commissioner additionally asserts that Nurse Dunaway did not cite to any evidence from her treatment records to support her opined limitations. (*Id.*) But as demonstrated above, this assertion is belied by Nurse Dunaway's opinion. The Commissioner additionally contends that Nurse Dunaway did not cite to any evidence from her treatment records to support these opined limitations. (*Id.*) But that assertion is also incorrect because Nurse Dunaway pointed to her objective findings from her treatment notes — intrusive thoughts and panic attacks. (Tr. 1696.) Moreover, Nurse Dunaway did opine as to the frequency or severity of these symptoms. Specifically, she opined that Mr. Carrillo would likely be off-task at least 20% of the time and absent from about four times a month. (*Id.*)

Finally, the ALJ's conclusion that Nurse Dunaway's treatment notes did not support the opined limitations is not supported by substantial evidence. The Commissioner cites to specific findings from Nurse Dunaway's mental status examination findings, such as observations of a well-groomed appearance, fair recent and remote memory, fair attention and concentration, adequate fund of knowledge, cooperative behavior, normal speech, intact language, logical thoughts, normal associations, fair insight and judgment, no suicidal ideation, and reports of "generally okay," "content," and "stable for the most part" mood. (ECF Doc. 10, PageID#1922

---

[9] The nature of this medical opinion is arguably a check-box form, but I need not address this issue as neither party raised this issue in their briefing. (*See generally* ECF Docs. 8, 10, 11.)

(citing Tr. 1833-35, 1838-39, 1842-43, 1869.)) Notably, some of these findings were not discussed by the ALJ in his opinion. Even reading the decision as a whole and with common sense, there is limited discussion regarding Nurse Dunaway's mental status examinations except for the findings from January 2021 (Tr. 196; *see* Tr. 1983) and March 2021 (Tr. 197; *see* Tr. 1834). Thus, the Commissioner's argument is post-hoc rationale rather than the rationale articulated by the ALJ.

And the ALJ's summary of the medical evidence undercuts the contention that Nurse Dunaway's treatment notes do not support the opined limitations. Indeed, the ALJ discussed instances from Nurse Dunaway's treatment notes where Mr. Carrillo reported intrusive thoughts and anxiety attacks. For example, the ALJ noted that in September 2020, Mr. Carrillo reported to Nurse Dunaway that that his panic attacks had been lower since his last visit, but they had increased in the past few weeks. (Tr. 196.) Similarly, the ALJ even observed that Mr. Carrillo reported to Nurse Dunaway in November 2020 that he had experienced more panic attacks in the past one to two months than he had in a while. (*Id.*) The ALJ then observed that in January 2021, Mr. Carrillo reported that his panic attacks increased in December and January. (*Id.*) Mr. Carrillo also reported intrusive thoughts every other day. (*Id.*) These statements would indicate that Nurse Dunaway's treatment notes do support that Mr. Carrillo experiences frequent panic attacks and intrusive thoughts. Thus, the ALJ's decision is internally inconsistent and cannot be reasonably construed as the ALJ finding that Nurse Dunaway's opinion was unsupported by her *own* treatment notes. Accordingly, the ALJ failed to meaningfully discuss supportability – one of the two most important factors in the persuasiveness evaluation.

### 3.  *The ALJ Did Not Appropriately Evaluate the Inconsistency of Nurse Dunaway's Medical Opinion.*

Consistency is defined as "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical

sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520(c)(2). As reproduced above, the ALJ's rationale for the consistency factor is that Nurse Dunaway's treatment notes were inconsistent with her opined limitations. (*See* Tr. 199.) Specifically, the ALJ reasoned that: (1) Mr. Carrillo's mental health conditions appear well controlled with medications; and (2) his mental status examinations noted he was cooperative, alert, oriented x3, and he had normal mood and affect. These reasons are not supported by substantial evidence.

The ALJ's reasoning that Mr. Carrillo's mental status examinations noted he had normal mood and affect is not an accurate characterization of the record evidence. The first issue with the ALJ's reasoning that he provides no citation in support of this proposition. This failure to provide citations is not necessarily fatal because a court may read the decision as a whole and with common sense to find support for the ALJ's findings. *See Buckhannon v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) ("[W]e read the ALJ's decision as a whole and with common sense."). But even reading this decision as a whole and with common sense, the ALJ's summary of the medical evidence does not support the ALJ's conclusion. For example, at his September 2020 appointment with Nurse Dunaway, Ms. Dunaway noted that Mr. Carrillo's mood was "low," and his mood was constricted. (Tr. 1842.) In March 2020, while Nurse Dunaway noted that Mr. Carrillo's mood was "generally ok," his affect was observed to be constricted. (Tr. 1348.) Moreover, at his April 2020 appointment with Nurse Dunaway, the treatment notes indicate that Mr. Carrillo's mood was "anxious," and his affect was constricted. (Tr. 1352.) Further, at an August 2021 appointment with New Leaf Counseling Services, Mr. Carrillo reported that his mood was swinging daily. (Tr. 1874.) To be fair, there are some limited notes that may support the ALJ's conclusion, such as Mr. Vu's observations in August and September 2020 that he had euthymic mood. (Tr. 1874.) And at some

points, Nurse Dunaway's treatment notes indicate that Mr. Carrillo reported moods such as being "generally okay today the last few weeks mood has been down" (Tr. 1838); "content today" (Tr. 1833); and "stable for the most part" (Tr. 1869.) But given the body of evidence demonstrating the exact opposite of the ALJ's conclusion, the ALJ's characterization of the evidence is a misstatement of the totality of the evidence.

The ALJ's conclusion that the Mr. Carrillo's mental health conditions are well controlled with medications is also not supported by substantial evidence. In fact, the ALJ again provides no citation to support this point. Reading this decision as a whole and with common sense, the ALJ did not provide adequate support to reach this conclusion. For example, despite Mr. Carrillo reporting in November 2020 that Effexor seemed to help, he also reported he experienced panic attacks more in the past one to two months than he had in a while. (Tr. 196.) He further reported that Remeron was a "hit or miss." (*Id.*) In January 2021, Mr. Carrillo did report that increasing Effexor was helpful and denied side effects, but he also reported his panic attacks increased in December and decreased in January. (*Id.*) He also reported intrusive thoughts every other day. (*Id.*) At his March 2021 appointment, Mr. Carrillo was taking Vistaril one to two times a week on average for anxiety attacks, and he reported that he was experiencing panic attacks every two weeks. (Tr. 197.) The treatment notes that the ALJ's decision discusses do not entirely support the ALJ's conclusion. Significantly, the Commissioner does not address how the ALJ's reasoning is supported by substantial evidence. (*See* ECF Doc. 10, PageID#1930.) Nor does Nurse Dunaway (or any other provider) indicate that Mr. Carrillo's mental health conditions are well-controlled by medications.

Based on the ALJ's citation of the record, the ALJ's conclusion appears to be an assumption without foundation. *See Takacs v. Kijakazi*, No. 1:20-CV-02120, 2022 WL 447700, at

*10 (N.D. Ohio Jan. 26, 2022), *report and recommendation adopted sub nom.*, *Takacs v. Comm'r of Soc. Sec.*, 2022 WL 445767 (N.D. Ohio Feb. 14, 2022) ("[T]reatment and medication decisions fall squarely into the medical judgment sphere, and an ALJ may not impermissibly displace a medical [provider]'s opinion based on the ALJ's lay interpretation of the evidence."); *Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006) ("[T]he ALJ may not substitute his own medical judgment for that of the treating physicians where the opinion of the treating physician is supported by the medical evidence…While the ALJ may have prescribed different pain medication than that prescribed by Plaintiff's doctors, this decision is beyond the expertise of the ALJ and is not a legitimate basis for an adverse credibility determination."). *Cf. Descott v. Comm'r of Soc. Sec.*, No. 1:16CV1271, 2017 WL 1050379, at *10 (finding the ALJ's conclusion that claimant's migraines were well controlled by medication did not violate the treating physician rule because she considered whether the opinions were well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the case record, provided good reasons for giving "little weight" to those opinions, and her conclusion was supported by substantial evidence).

The ALJ has the duty to assess the medical and non-medical evidence and determine an RFC finding. "[A] bright line is not always apparent when carrying out this duty." *Takacs*, 2022 WL 447700, at *11. But the reasons the ALJ provided here generally lack any clear citation to the record, are inaccurate, and are not supported by substantial evidence. The ALJ must build an accurate and logical bridge between the evidence and the ALJ's conclusion. *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011). Where, as here, "the ALJ's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Castello v. Comm'r of Soc. Sec.*, No. 5:09CV 2569, 2011 WL 610590, at *2 (N.D. Ohio Jan. 10,

2011), *report and recommendation adopted sub nom. Castello v. Comm'r of Soc. Sec.*, 2011 WL 610138 (N.D. Ohio Feb. 10, 2011)(quoting *Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007) (internal quotation omitted); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995) (the ALJ's analysis must allow the reviewing court to trace the path of reasoning)). Accordingly, I recommend that the Court vacate and remand this matter to appropriately consider the persuasiveness of Nurse Dunaway's opinions in accordance with the Social Security regulations.

## VI.   RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court VACATE and REMAND the ALJ's decision to the Commissioner for further proceedings consistent with this Report and Recommendation.

Dated: November 7, 2023                                    s/ *Jennifer Dowdell Armstrong*
                                                           Jennifer Dowdell Armstrong
                                                           U.S. Magistrate Judge

## VII.   NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge,

making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d 505). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).